**United States District Court**
For the Northern District of California

1
2
3
4
5
6                     IN THE UNITED STATES DISTRICT COURT

7                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

8
9
10    SHEILA PIERCE,                           No. CV 09-03837 WHA

11              Plaintiff,

12       v.                                    **ORDER ON CROSS-MOTIONS**
                                               **FOR SUMMARY JUDGMENT**
13    KAISER FOUNDATION HOSPITALS,
      LOCAL 29, OFFICE AND PROFESSIONAL
14    EMPLOYEES INTERNATIONAL UNION,
      AFL-CIO AND CLC, and DOES 1
15    THROUGH 25,

16              Defendants.
      _____/
17

18                            **INTRODUCTION**

19           In this labor dispute involving a discharged hospital employee, her former employer, and

20    her local union, all parties move for summary judgment on plaintiff's claims brought pursuant to

21    Section 301 of the Labor Management Relations Act, 29 U.S.C. 141, *et seq*.  As alleged in her

22    complaint, plaintiff contends that was discharged from her job without "just cause" in violation of

23    the collective bargaining agreement that governed her employment.  Specifically, plaintiff argues

24    that she was not responsible for the disappearance of $255 in co-payments and admission fees

25    that she had collected from hospital patients on behalf of her former employer.  Plaintiff also

26    claims that her local union breached its duty of fair representation to her when it decided to

27    forego arbitration on her grievance against the hospital for terminating her employment.

28

**United States District Court**
For the Northern District of California

1    As explained herein, plaintiff's claims fail on multiple levels.  *First*, the undisputed record

2    demonstrates that the union was named as a defendant to this action long after the six-month

3    statute of limitations period for plaintiff's claims had expired.  Plaintiff has not shown that this

4    untimely amendment "relates back" to the filing date of the original complaint under FRCP 15(c).

5    In other words, her claims against the union are indisputably time-barred.  *Second*, plaintiff's

6    allegations against both defendants are wholly unsupported by admissible evidence.  To survive

7    defendants' motions for summary judgment (let alone prevail on her own motion), plaintiff had to

8    produce competent evidence to enable a reasonable jury to find that she was terminated by her

9    employer without "just cause" and that her local union did not provide her with fair

10   representation.  Instead of producing evidence to support such allegations, however, plaintiff

11   merely argued (and submitted a single declaration filled with inadmissible material) that she was

12   not responsible for the $255 in missing funds.  This, of course, is entirely besides the point.

13   *Whether plaintiff actually took the $255 dollars is irrelevant to whether her employer, after*

14   *investigating the incident, believed it had "just cause" to fire her and whether her union, after*

15   *examining the merits of her grievance, breached its duty of fair representation to her by declining*

16   *to take her grievance to arbitration*.  On these issues, both defendants produced undisputed

17   evidence that summary judgment in their favor should be granted.

18       For these reasons, plaintiff's motion for partial summary judgment is **DENIED**.  The

19   motions for summary judgment filed by both defendants are **GRANTED**.

20                                        **STATEMENT**

21       Plaintiff Sheila Pierce, a member in good standing of Office and Professional Employees

22   International Union, Local 29, AFL-CIO ("OPEIU Local 29") during the events at issue herein,

23   was hired by defendant Kaiser Foundation Hospitals as an on-call "admitting clerk" in December

24   2004.  She was stationed in the emergency department of Kaiser's Oakland Medical Center

25   (Pierce Dep. 15, 122–23; Pierce Decl. ¶¶ 4–5; Thurston Decl. ¶ 6).  Shortly thereafter, plaintiff

26   became an "admitting representative" at Kaiser, which involved the collection of revenue from

27   patients (*e.g.*, co-payments and admission fees), completing documents for and with patients for

28   the purpose of admitting them into the hospital, and keying patient information into Kaiser's

computer system (Pierce Dep. 127–29, Exh. 14; Thurston Decl. ¶ 7).  During her employment at Kaiser, plaintiff was supervised by Sondra Thurston, Kaiser's Administrative Services Manager, and Marquette Stockton, Kaiser's Administrative Services Supervisor at the time (Pierce Dep. 121; Stockton Decl. ¶ 3; Thurston Decl. ¶ 3).

     **1.**      **REVENUE COLLECTION, THE CASH HANDLING AGREEMENT, AND KAISER'S PRINCIPLES OF RESPONSIBILITY**

Plaintiff's "revenue collection" duties are central to the instant dispute.  A description of these duties was provided by plaintiff in a written statement prepared for OPEIU Local 29 just prior to her termination by Kaiser.  Portions of this statement are reproduced below (Pierce Dep. 27–30, Exh. 2) (all errors in original):

> If the patient have a co-pay, I will go to my cash drawer and log the amount that was received from the patient into the system known to Kaiser as Health Connect.
>
> If the patient have cash I enter into cash drawer content, each domination.  For example there is a column which is called Quantity.  That's where I log how many $100.00, $50.00, $20.00, $5.00 and $1.00 bills that I received.  I also log credit cards and checks amount into the same system.
>
> Then I would take the cash and put it into the yellow and gray envelope, which is where we put cash and checks only.  The other envelope, which is pink, we put credit card authorization only.
>
> At this point it's still too early to do my drop, which is when we go to the safe and drop the yellow and gray envelope into the safe with the money inside.  So what I do until I drop the money, I lock it up in the small locker that I have within the Admitting Department.  This is to make sure the money is secured.
>
> When it's getting close to the end of my shift I then go back to my locker and get envelopes.  I bring it back to my desk and than I'm ready to close my drawer.  I check to make sure all of my amount correct.  Than I put in my NUID and my cash drawer no. [numbers excluded] . . . and than I close my drawer, 100% of time I balance.
>
> So than I'll take the two envelopes, the yellow and gray one and the pink one to the safe room.  The yellow and gray goes into the safe, where there is a drawer you drop the envelope in.  The pink envelope you drop it a box that mounted on the wall in the safe room.

Once plaintiff placed the deposit envelopes into Kaiser's safe, a separate company called Loomis would pick them up and process the deposits (Thurston Decl. ¶ 9).

United States District Court

For the Northern District of California

3

**United States District Court**
For the Northern District of California

1    As a union member, plaintiff was subject to Kaiser's Cash Handling Responsibility

2  Agreement: Local 29 ("Cash Handling Agreement"), which she acknowledged reviewing and

3  signing more than once during her employment with Kaiser (Pierce Dep. 150–52, Exh. 18).  The

4  Cash Handling Agreement set forth the responsibilities and policies that applied to union

5  employees like plaintiff who regularly handled cash at the hospital (Thurston Decl. ¶ 8).  In

6  particular, it stated that an employee who handled cash is "responsible for the safekeeping of [her]

7  change fund" and "all revenues collected during [her] shift," and that an employee must "never

8  leave cash unattended."  The agreement further stated that employees must ensure that daily cash

9  deposit envelopes are "sealed and clearly identified with [the employee's] name, department, ID,

10  and current date."  Finally, the agreement stated that an employee is "responsible for ensuring that

11  [her] own cash/document envelopes have completely fallen into the designated safe and are

12  irretrievable" at the end of the employee's shift (*id.* at ¶ 9; Pierce Dep. Exh. 18).  At her

13  deposition, plaintiff insisted that she followed this procedure "to a 'T'" when she handled cash

14  while employed at Kaiser (Pierce Dep. 151).

15    In addition to the Cash Handling Agreement, plaintiff was also bound by the hospital's

16  "Principles of Responsibility" agreement.  This agreement required all Kaiser employees to

17  safeguard the hospital's property — including funds collected — and conduct themselves in an

18  ethical manner at all times (Thurston Decl. ¶ 10; Pierce Dep. 168–69, Exh. 21).

19         **2.    THE COLLECTIVE BARGAINING AGREEMENT**

20    A collective bargaining agreement ("CBA") reached between OPEIU Local 29 and

21  Kaiser, effective October 1, 2005, governed plaintiff's employment during the events at issue

22  (Pierce Decl. ¶ 5; Pierce Dep. 124–25, Exh. 15; Thurston Decl. ¶ 7).  Directly relevant to the

23  instant dispute, the CBA provided that Local 29 employees could only be disciplined or

24  discharged by Kaiser for "just cause."  While the CBA did not define "just cause," plaintiff

25  testified at her deposition that she understood the "just cause" restriction set forth in the CBA to

26  mean that there "has to be a reason for them to say good bye.  It has to be a reason for them to

27  terminate you" (Pierce Dep. 126).  The CBA also set forth the grievance and arbitration procedure

28

4

if such disciplinary actions were taken by Kaiser against an employee (Pierce Decl. ¶ 22; Pierce Dep. 125–26, Exh. 14).  Specifically, the CBA stated (Pierce Dep. Exh. 14 at 41):

Article XXVII – DISCIPLINE

190.    Discipline and/or discharge shall be administered only for just cause.  Before being used as the basis for discipline, patient and physician complaints will be investigated and discussed with the employee.  An employee may request to have a union representative present at a meeting with the Employer when the employee reasonably believes such meeting may result in disciplinary action.  Furthermore, the Employer shall advise an employee in advance if a requested meeting may result in suspension, discharge or other discipline of the employee.

The CBA set forth a four-step grievance procedure (to be followed by both the union and the employer) in the event that an employee was disciplined or discharged by Kaiser.  The first step of the grievance procedure involved a discussion between the employee's union representative and the employee's immediate supervisor at Kaiser.  If the response from the supervisor was not "satisfactory" to the aggrieved employee and/or the union representative, either of them could elect to proceed to the second step of the grievance process.  The second step of the process involved a discussion between the employee's union representative and Kaiser's personnel director.  If a "satisfactory adjustment" was not obtained from the personnel director, the employee could then elect to proceed to the third step of the grievance process — a discussion between the union's business agent and Kaiser's employee relations manager.  Finally, if such discussions failed to produce a "satisfactory" outcome, the *union* (but not the employee) would have the option to proceed to the fourth step of the process — arbitration (*id.* at 42–43).

3.    THE MISSING FUNDS

In early 2008, plaintiff's supervisors at Kaiser — Marquette Stockton and Sondra Thurston — were informed that a cash deposit envelope placed in Kaiser's safe by plaintiff on January 29, 2008, was missing $255 in cash that she had reported collecting from two Kaiser patients that day (Stockton Decl. ¶ 5; Thurston Decl. ¶ 11).  The supervisors learned of the shortfall in a report prepared and provided by Loomis, the company that processed the cash and check-filled envelopes placed in Kaiser's safe by its admitting representatives.  This discrepancy

5

United States District Court

For the Northern District of California

1   was promptly reported by the supervisors to Kaiser's operations and investigations manager,

2   Douglas Lynch, who initiated an investigation into the matter (Lynch Decl. ¶¶ 4–6; Stockton

3   Decl. ¶ 5; Thurston Decl. ¶ 11).  As part of his investigation, Manager Lynch attempted to contact

4   the two Kaiser patients who had supposedly given plaintiff the $255 in question.  The one patient

5   who could be reached stated that he had paid his fee in cash to a woman in her forties, but could

6   not recall her name (Lynch Decl. ¶ 6).  Manager Lynch and Supervisor Thurston then discussed

7   the investigation in March 2008 and decided to meet and interview plaintiff to provide her with

8   an opportunity to explain the missing funds (*id.* at ¶ 7; Thurston Decl. ¶ 12).

9          On April 22, 2008, Supervisor Stockton called plaintiff into her office and notified her that

10  Kaiser was investigating $255 in missing funds from her January 29 cash/check deposit envelope.

11  Plaintiff was informed that a meeting would take place on April 29 and that she would need a

12  union representative to be present (Stockton Decl. ¶ 6; Pierce Dep. 19).  While being told of the

13  missing funds at this April 22 meeting, plaintiff immediately went to her locker and retrieved a

14  receipt from January 29 evidencing the funds that she had collected from patients that day (Pierce

15  Dep. 19–21, Exh. 1).  Plaintiff showed the receipt to Supervisor Stockton, who confirmed that the

16  investigation and meeting pertained to those exact funds (*id.* at 21).  Plaintiff then informed

17  Supervisor Stockton that she wanted a specific union representative named Terry Keller (who was

18  *not* the union representative that would have normally been assigned to her) to represent her at the

19  April 29 meeting (*id.* at 22).

20         At the April 29 meeting, the union provided Kaiser with a written statement prepared by

21  plaintiff detailing the cash handling procedures she had followed as an admitting representative,

22  both in general and on the day in question (*id.* at 27, Exh. 2; Keller Decl. ¶ 3, Exh. B).  A large

23  excerpt from this statement was reproduced earlier in this order.  Manager Lynch, who led the

24  meeting on behalf of Kaiser, informed plaintiff that upon receiving and opening her January 29

25  cash/check deposit envelope, Loomis discovered that the envelope did not contain any cash

26  (Pierce Dep. 29–30; Lynch Decl. ¶ 8).  He then asked plaintiff a number of questions regarding

27  the cash handling procedures she had followed on January 29, which Union Representative Keller

28  assisted plaintiff in answering (Keller Decl. ¶ 3).  Plaintiff's response to Manager Lynch (and all

others in attendance) was that she handled the money "exactly the way I was trained to do, and I followed it to a 'T'" (Pierce Dep. 29). This was also emphasized in the written statement she had provided to Kaiser (*id*. at 29, Exh. 2) (all errors in original):

> On the date of January 29, 2008, I did collect co-pay of $250.00 in cash for admission fee and a co-pay of $5.00 also in cash. I have the receipt for the $250.00 that I collected. I do not have the receipt for the $5.00. However, both transactions was logged into the system.
>
> If I was trying to steal money from Kaiser, Why would I logged everything into the system, which tell times and dates and who handle the money? I think I would be consider one of the world's dumbest criminal.

In other words, plaintiff told Kaiser that she had properly placed the $255 into her deposit envelope on the day in question, that no other employee had handled the deposit envelope prior to it being sealed, that she sealed the envelope with the cash inside of it, that she signed the envelope with her name pursuant to Kaiser's cash handling procedures, and that she had placed the envelope into Kaiser' safe and double-checked to ensure that it was irretrievable (*id.* at 30, 40; Lynch Decl. ¶ 10; Stockton Decl. ¶ 7; Thurston Decl. ¶ 13). After proclaiming her innocence, plaintiff then suggested that a Loomis employee must have tampered with the deposit envelope and taken the $255 in cash (Lynch Decl. ¶ 11; Thurston Decl. ¶ 14; Stockton Decl. ¶ 8; *see also* Pierce Dep. 66–67).

### 4.  KAISER'S POST-MEETING INVESTIGATION AND PLAINTIFF'S TERMINATION

Following the April 29 meeting, Manager Lynch contacted the specific Loomis facility that had processed the envelope in question and confirmed with Loomis representatives that the envelope contained no cash when it was opened at the facility (Lynch Decl. ¶ 12). Approximately two weeks later, on May 12, Manager Lynch, Supervisor Stockton, and Supervisor Thurston made an in-person visit to the Loomis facility. While at the facility, a Loomis representative showed each of them a video recording from January 29 of the particular Loomis employee who had received and opened the "empty" cash envelope signed by plaintiff that day. The video — according to Manager Lynch, Supervisor Stockton, and Supervisor Thurston — showed the Loomis employee slicing open one side of the envelope, looking inside, and removing a single

United States District Court
For the Northern District of California

sheet of paper but no cash.  The video then showed the employee immediately signaling for a supervisor to inspect the envelope.  The supervisor, after inspecting and shaking the envelope, confirmed that no cash was contained within it.  The Loomis representative who showed this video to Manager Lynch, Supervisor Stockton, and Supervisor Thurston then explained to them that the employee in the video who processed the envelope followed the standard method of opening deposit envelopes by cutting them along the side so as to not disturb the original seal (*id.* at ¶ 13; Thurston Decl. ¶ 15; Stockton Decl. ¶ 9).[1]

In addition to visiting the Loomis facility, Manager Lynch also requested from Loomis the original deposit envelope signed and placed by plaintiff into Kaiser's safe on January 29.  After being provided with the envelope by Loomis, Manager Lynch inspected the seal and observed no signs of tampering (Lynch Decl. ¶ 14).  In this connection, during her deposition, plaintiff freely admitted that tampering with a Kaiser deposit envelope after it had been sealed would be "very difficult to do" and that if the seal had been broken and resealed, a person "definitely" would be able to tell (Pierce Dep. 177–79).  Manager Lynch, after completing his investigation of the missing $255 in funds, concluded from the evidence that — despite her statements to the contrary — plaintiff had not placed any cash inside her deposit envelope before dropping it into Kaiser's safe on January 29, 2008 (Lynch Decl. ¶ 15).

Finally, according to Supervisor Stockton, this was actually the *second* time that Kaiser had investigated plaintiff for a cash shortfall in one of her deposit envelopes.  In 2006, a deposit envelope signed by plaintiff and dropped into Kaiser's safe did not contain $550 in cash that she had supposedly collected from patients.  During the course of investigating this incident, however, Loomis could *not* provide Kaiser with conclusive video evidence that plaintiff's deposit

---

[1] Plaintiff objects to the observations of the Loomis video set forth in the declarations of Lynch, Thurston, and Stockton.  These objections are **OVERRULED**.  The video itself is not being offered as evidence of what actually occurred at the Loomis facility.  The descriptions of the video are only being offered as evidence of what Manager Lynch and Supervisors Thurston and Stockton observed first-hand while at the Loomis facility.  Similarly, plaintiff's hearsay objection regarding the "standard method" used by Loomis employees to open envelopes is **OVERRULED**.  This information is not being offered for the truth of the matter asserted.  Rather, like the video observations, this evidence is being offered to show that Kaiser investigated the incident and did not act arbitrarily and without "just cause" when terminating plaintiff's employment.  Again, whether plaintiff *actually* took the funds is *not* at issue in this litigation.

United States District Court
For the Northern District of California

1    envelope was empty when it arrived at the Loomis facility.  Absent such proof, Kaiser declined to

2    discipline plaintiff in 2006 (Stockton Decl. ¶ 10).

3           Based upon Manager Lynch's investigation and all of the evidence discussed herein,

4    Kaiser terminated plaintiff's employment on May 29, 2008, for violating both the Cash Handling

5    Agreement and the hospital's Principles of Responsibility agreement (Thurston Decl. ¶ 17; Keller

6    Decl. ¶ 4, Exh. C).

7           **5.      THE GRIEVANCE PROCESS**

8           Pursuant to the terms of the CBA, Union Representative Keller — at plaintiff's request —

9    filed a timely grievance with Kaiser on behalf of plaintiff on June 2, 2008, challenging her

10   termination and demanding reinstatement on the grounds that Kaiser had violated the CBA and

11   had not discharged plaintiff for "just cause" (Thurston Decl. ¶ 17; Keller Decl. ¶ 5, Exh. D).

12   Plaintiff was represented by Ms. Keller throughout the entire multi-step grievance process

13   detailed herein (Keller Decl. ¶ 6).  At the "step one" grievance meeting held on July 8, 2008,

14   Ms. Keller advanced plaintiff's position that she had done nothing improper in connection with

15   the $255 in missing funds.  No "satisfactory" resolution was reached following the July 8 meeting

16   (*id*. at ¶ 7).  With the consent of plaintiff, Ms. Keller then expedited the grievance process by

17   seeking a "combined" step two/three meeting with Kaiser, as expressly allowed under the terms

18   of the CBA (*id.* at ¶ 8, Exh. E).  This step two/three meeting was held on August 15, 2008.  At the

19   August 15 meeting, Ms. Keller again advanced plaintiff's position that she had properly followed

20   Kaiser's cash handling procedures and had done nothing improper on the day in question (*id.* at ¶

21   9, Exh. F).  Four days later, Ms. Keller sent Kaiser a letter requesting all information "relevant to

22   the grievance," including plaintiff's employment file, all discipline imposed upon plaintiff by

23   Kaiser, all discipline imposed upon other union members in her department, and all documents

24   related to plaintiff's termination (*id.* at ¶ 10, Exh. G).

25          After Kaiser failed to provide the union with a timely response following the "step three"

26   meeting, Ms. Keller moved the grievance to "step four" arbitration on September 18, 2008,

27

28

pursuant to the terms of the CBA.[2]  Ms. Keller also filed an unfair labor practice charge with the National Labor Relations Board in October 2008 seeking to compel Kaiser to produce the information requested in her August 19 letter (*id.* at ¶¶ 11–12, Exhs. H and I).  On November 14, she then met with Kaiser representatives to review the evidence in Kaiser's possession relevant to plaintiff's grievance.  At this meeting, Ms. Keller was shown the original deposit envelope that plaintiff had used on the day in question.  The envelope, in Ms. Keller's opinion, showed no signs of tampering (*id.* at ¶¶ 13–14, Exh. J).  The very next day, Kaiser provided her with additional information relevant to the merits of plaintiff's grievance that she had requested three months earlier.  Having finally obtained this information, Ms. Keller withdrew the NLRB charge she had filed in October to compel its production (*id.* at ¶ 15).

OPEIU Local 29 officials and union counsel then discussed the merits of plaintiff's grievance at a "pre-arbitration meeting" held on February 11, 2009 (*id.* at ¶ 16).  The purpose of such meetings — which were held approximately every other month — was to enable union counsel to assess the merits of pending grievances and determine which ones were likely to succeed at arbitration (Baker Decl. ¶ 3).  Attorney Andrew Baker, who has served as legal counsel for OPEIU Local 29 since 2007, was present at the February 11 pre-arbitration meeting (*id.* at ¶¶ 2–4).  Attorney Baker evaluated plaintiff's grievance based upon Ms. Keller's explanation of Kaiser's evidence and advised the union that plaintiff's mere denial of culpability would not necessarily be sufficient to win at arbitration.  He further advised the union that if Kaiser had evidence to prove that the deposit envelope in question was sealed and empty when it arrived at the Loomis facility, then an arbitrator would likely conclude that plaintiff was responsible for the cash shortage (*id.* at ¶¶ 4–6).  Attorney Baker also told union officials that a very similar matter was taken to arbitration recently, and the union had lost (*id.* at ¶ 5).  Based upon these considerations, Attorney Baker recommended that the union forego arbitrating plaintiff's grievance if Ms. Keller believed that Kaiser's evidence was sufficient to persuade an

---

[2]  The CBA provided that "if the Employer fails to answer a grievance at any step within the specified time limit, the grievance shall automatically be appealed to the next step" (Keller Decl. Exh. A at 43).

United States District Court

For the Northern District of California

1   arbitrator that the envelope was sealed and empty when opened by Loomis employees (*id.* at ¶ 6;

2   Keller Decl. ¶ 16).

3        On February 23, 2009, Ms. Keller finally received a written response from Kaiser to "step

4   three" of the grievance process.  In its letter, Kaiser reiterated that it had evidence that the deposit

5   envelope placed in Kaiser's safe by plaintiff on January 29, 2008, was sealed and devoid of cash

6   when opened by Loomis employees, and that several Kaiser employees had personally viewed a

7   video recording at the Loomis facility confirming these facts (Keller Decl. ¶ 17, Exh. L).  After

8   discussing the matter with Tamara Rubyn, who was (and still is) OPEIU Local 29's president and

9   principal officer, Ms. Keller informed plaintiff through a letter dated March 4, 2009, that the

10  union believed it could *not* prevail in arbitration against Kaiser and that the grievance would not

11  be appealed to "step four" arbitration (*id.* at ¶¶ 17–18, Exh. M).

12       As a last resort, plaintiff — independently and without the union's assistance — filed a

13  charge of unfair labor practices against OPEIU Local 29 with the NLRB on June 1, 2009 (Castillo

14  Decl. ¶ 7, Exh. E).  On August 21, the NLRB informed plaintiff, after it "carefully investigated

15  and considered" the allegations, that it would *not* issue a complaint against the union because the

16  evidence did not show that the union's "decision in this regard was tainted by any arbitrary,

17  invidious or discriminatory considerations" (*id.* at ¶ 8, Exh. F).  An appeal of the NLRB's

18  decision was denied for the same reasons (*id.* at ¶¶ 9–10, Exhs. G and H).

19       **6.   PROCEDURAL HISTORY**

20       Plaintiff filed this action against Kaiser Foundation Hospitals in Alameda County Superior

21  Court on May 28, 2009.  OPEIU Local 29 was *not* a party to the original complaint.  The

22  complaint alleged various contract and tort claims against Kaiser based upon its alleged breach of

23  the governing CBA.  Kaiser timely removed the action after being served with a copy of the

24  summons and complaint in late July 2009 (Dkt. No. 1).  The basis of the removal was that all of

25  plaintiff's state claims were preempted under Section 301 of the LMRA.

26       A week after removal, Kaiser moved to dismiss the complaint on the same preemption

27  grounds (Dkt. No. 8).  The motion was granted (Dkt. No. 15).  Plaintiff, who had retained counsel

28  during the pendency of the motion to dismiss, then timely moved for and obtained leave to file a

first amended complaint (Dkt. Nos. 16, 24). In addition to recasting plaintiff's state claims as "unfair labor practices" in violation of the LMRA, the amended complaint added a new party — OPEIU *International* — as a named defendant (Dkt. No. 29). A further amendment was made to the complaint in February 2010 to name OPEIU Local 29 (rather than the international union) as the proper union defendant (Dkt. No. 32).

Critically, it was not until mid-December 2009 when OPEIU Local 29 received actual notice that plaintiff had filed a lawsuit alleging that she had received unfair representation in connection with her union membership. Specifically, attorneys for Kaiser contacted the local union and notified it that Pierce had filed a first amended complaint and that OPEIU Local 29 appeared to be targeted therein (Rubyn Decl. ¶ 2).

## 7.   DEFENDANTS' EVIDENTIARY OBJECTIONS

Given that the evidentiary objections raised by both defendants are numerous, they will be addressed *en masse* in this portion of the order. As a preliminary matter, this order emphasizes that plaintiff's *only* evidence submitted in support of her summary judgment motion (and in opposition to defendants' motions for summary judgment) are her own declarations that essentially repeat the factual allegations in the operative complaint (*compare* Compl. ¶¶ 10–37 *with* Pierce Decl. ¶¶ 4–31).[3] This "copy and paste" maneuver has generated a slew of evidentiary problems.

For example, numerous statements in plaintiff's declarations contain legal conclusions that are inadmissible. Specifically, plaintiff alleges in her declarations that defendants "breached" and "violated" various agreements and laws, including the CBA and the LMRA (Pierce Decl. ¶¶ 22, 31). Defendants' evidentiary objections that these statements are inadmissable legal conclusions are SUSTAINED. Similarly, plaintiff's statements that defendants acted in "bad faith" and "without cause or justification" in leveling a "baseless charge" against plaintiff also call for

---

[3] The citations to plaintiff's declaration herein are to her *original* declaration filed in support of her motion for summary judgment (Dkt. No. 53). All of plaintiff's declarations contain the same (or substantially the same) content as found in her original declaration. Plaintiff also filed a *reply* declaration on October 16 to "supplement" the contents of her original declaration (Dkt. No. 75). Aside from being procedurally improper, nothing that plaintiff added in her reply declaration is relevant to or affects the outcome of this order.

United States District Court
For the Northern District of California

legal conclusions (and, in any event, are entirely conclusory) (*id.* at ¶¶ 9–10, 12, 20, 29–30).

Defendants' objections targeting these statements are also **SUSTAINED**.

Plaintiff's declarations also contain statements that either lack personal knowledge or are contradicted by her own deposition testimony. For example, plaintiff makes the following unsubstantiated statement in her declarations (*id.* at ¶ 26):

> For approximately a year after the false accusations of theft were made against me, nothing was done by either Defendant Kaiser or Defendant Local 29 Office Workers and Professional Employees International Union, (OPEIU, AFL-CIO) to expedite or bring said grievance to arbitration as required by paragraph XXVII, Section 6 of said Collective Bargaining Agreement.

The evidentiary problems with this statement are numerous. *First*, in her deposition, plaintiff freely admitted that her union representative, Ms. Keller, specifically asked her: "Do you want to combine step two and step three together to expedite this whole matter?" In response, plaintiff stated that she "agreed to do that" (Pierce Dep. 51). *Second*, plaintiff's statement that "nothing was done" by defendants "to expedite or bring said grievance to arbitration" is both unsupported by the record and contradicted by undisputed evidence that numerous actions were taken by the union with respect to plaintiff's grievance pursuant to the CBA.

In the same vein, plaintiff's declaration also contains numerous statements that purport to describe defendants' state-of-mind or motivations behind their various decisions and actions — *e.g.*, that defendants "knowingly falsely accused" plaintiff of embezzlement, "ignored the overwhelming evidence" of her innocence, and acted in a way that was "designed to deprive" her of rights under the CBA (Pierce Decl. ¶¶ 19, 24, 30). Plaintiff has no personal knowledge of any of these purported "facts," and the undisputed record contradicts these conclusory statements and unsupported conjecture. Defendants' evidentiary objections to all of these inadmissible statements are **SUSTAINED**.

Finally, a number of hearsay objections were raised by defendants. All of them have merit. For example, in plaintiff's declaration, she stated: "In fact, Terry Keller, Defendant Local 29's Union business representative, informed me on several occasions that Kaiser had presented no evidence to justify my termination" (*id.* at ¶ 25). To the extent that Ms. Keller's statement is

13

United States District Court

For the Northern District of California

1   being offered to prove the truth of the matter asserted (namely, that Kaiser "had presented no

2   evidence to justify [plaintiff's] termination"), defendants' objections are **SUSTAINED**.

3   Additionally, plaintiff's declaration contains a number of statements that were supposedly made

4   by various Kaiser employees or union representatives (*id.* at ¶¶ 12–17).  To the extent that these

5   statements are offered for the truth of the matter asserted, defendants' objections are also

6   **SUSTAINED**.  Plaintiff does not argue that any hearsay exceptions apply to these statements, and

7   this order can identify none that would apply.[4]

8           In sum, stripped bare of its inadmissible elements, the declarations submitted by plaintiff

9   support only her *opinion* that she was terminated without "just cause" and that she was denied fair

10  representation.  This opinion is based entirely upon plaintiff's assertion that she did not steal the

11  "missing" funds.  She has no personal knowledge of any of the investigatory work performed by

12  the hospital prior to her termination, and has no personal knowledge of the union's due diligence

13  in handling her grievance besides what she observed first-hand.  As explained below, plaintiff has

14  failed to create a triable issue on any of the claims alleged herein.

15                                      **ANALYSIS**

16          Summary judgment is proper when the "pleadings, depositions, answers to interrogatories,

17  and admissions on file, together with the affidavits, show that there is no genuine issue as to any

18  material fact and that the moving party is entitled to judgment as a matter of law."  FRCP 56(c).

19  An issue is "genuine" only if there is sufficient evidence for a reasonable fact-finder to find for

20  the non-moving party, and "material" only if the fact may affect the outcome of the case.

21  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).  All reasonable inferences,

22  however, must be drawn in the light most favorable to the non-moving party.  *Olsen v. Idaho*

23  *State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).  That said, unsupported conjecture or

24  conclusory statements are insufficient to defeat summary judgment.  *Surrell v. Cal. Water Serv.*

25  *Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008).

26

27          [4] Critically, it appears that plaintiff did not depose any of the union representatives or Kaiser

28  employees mentioned in her declaration.  Had she done so, she might have uncovered admissible evidence to
    support the allegations set forth in her complaint.  Instead, plaintiff has produced no evidence regarding the due
    diligence (or lack thereof) performed by either defendant or the *actual* bases for their decisions.

United States District Court
For the Northern District of California

1    The instant dispute involves two interrelated claims.  *First*, plaintiff alleges that Kaiser

2  violated the CBA governing her employment by discharging her without "just cause."  As stated

3  in the complaint, this move by Kaiser was supposedly an "unfair labor practice" in violation of

4  Section 8(a) of the LMRA, 29 U.S.C. 158(a) (*id.* at ¶ 35).  *Second*, plaintiff contends that OPEIU

5  Local 29 violated its duty of fair representation to her when it decided to forego arbitration of her

6  grievance against Kaiser.  This too supposedly constituted an "unfair labor practice" under the

7  LMRA, 29 U.S.C. 158(b) (*see* Compl. ¶ 34).  Plaintiff brings this suit pursuant to the provisions

8  of Section 301 of the LMRA.  *See* 29 U.S.C. 185.

9        **1.    TIMELINESS OF THE ACTION**

10    According to OPEIU Local 29, plaintiff failed to name the union as a defendant in this

11  action within the six-month limitations period that applies to her claims.  Because of this failure,

12  plaintiff's claims against the union are time-barred.  As explained below, the union is right.

13    The instant dispute involves what the Supreme Court has deemed "a hybrid § 301/fair

14  representation claim."  *DelCostello v. Teamsters*, 462 U.S. 151, 163–65 (1983).  Such claims

15  involve allegations under Section 301 of the LMRA that an employer has breached the terms of a

16  CBA as well as allegations "implied under the scheme of the National Labor Relations Act" that

17  the union breached its duty of fair representation to the employee in subsequent grievance and

18  arbitration procedures.  *Id.* at 164.  A "hybrid" LMRA Section 301 claim is subject to a six-month

19  statute of limitations period.  *Id.* at 169; *see also* 29 U.S.C. 160(b).

20    There is no dispute that the instant action involves a "hybrid" LMRA Section 301 claim

21  that is subject to a six-month limitations period (*see* P's Opp. to OPEIU's Mot. 12).  The statute

22  of limitations for such claims begins to run when a plaintiff "knew, or should have known, of the

23  defendant's wrongdoing."  *Stone v. Writer's Guild of America West, Inc.*, 101 F.3d 1312, 1314

24  (9th Cir. 1996).  In this connection, there is also no dispute that plaintiff Sheila Pierce knew (or

25  should have known) of the union's alleged "wrongdoing" on or shortly after March 4, 2009, when

26  she received a letter from OPEIU Local 29 notifying her that the union had decided to forego

27  arbitration of her grievance against Kaiser (*ibid.*; OPEIU Br. 7).  Indeed, plaintiff's opposition

28  brief to the union's summary judgment motion expressly acknowledges that this action is subject

15

United States District Court

For the Northern District of California

1   to a "six month statute of limitations period *beginning March 4, 2009*" (P's Opp. to OPEIU's

2   Mot. 12) (emphasis added).  As such, even assuming that plaintiff received the March 4 letter a

3   few days after that date, the complaint had to have been filed against the union no later than six-

4   months later in September 2009.  *See West v. Conrail*, 481 U.S. 35, 39–40 n.7 (1987).

5        The original complaint in this action was filed in May 2009 in Alameda County Superior

6   Court, well within the six-month limitations period.  That complaint, however, only named Kaiser

7   as a defendant.  OPEIU Local 29 was not added to this action until long after the six-month

8   limitations period had expired.  In fact, no union entity was even a named party to the instant

9   lawsuit until the first amended complaint was filed in December 2009.  That complaint

10  erroneously named the *international* union (rather than the local chapter of OPEIU) as a

11  defendant.  It was not until February 2010 that OPEIU Local 29 was finally added as a party to

12  this "hybrid" LMRA Section 301 action.

13       Given these undisputed facts, this order agrees with the union that its late addition to the

14  instant dispute bars plaintiff's claim against it as a matter of law.  Absent a legitimate argument of

15  equitable estoppel or equitable tolling (which plaintiff neither pleaded nor argued in her papers),

16  the only theory under which the untimely addition of OPEIU Local 29 can be excused is if the

17  first amended complaint "relates back" to the original complaint under FRCP 15(c).  The

18  particular rule on whether the addition of a new party "relates back" to an original or prior

19  pleading — FRCP 15(c)(1)(C) — states:

20       (1) *When an Amendment Relates Back.*  An amendment to a
         pleading relates back to the date of the original pleading when:
21
                    *              *              *
22
         (C) the amendment changes the party or the naming of the party
23       against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied
         and if, within the period provided by Rule 4(m) for serving the
24       summons and complaint, the party to be brought in by amendment:

25           (i) received such notice of the action that it would not be
             prejudiced in defending on the merits; and
26
             (ii) knew or should have known that the action would have
27           been brought against it, but for a mistake concerning the
             proper party's identity.
28

16

United States District Court

For the Northern District of California

1    Additionally, FRCP 15(c)(1)(B) — which is cross referenced in the above rule — states:

2        (B) the amendment asserts a claim or defense that arose out of the
         conduct, transaction, or occurrence set out — or attempted to be
3        set out — in the original pleading

4    Even assuming that the claims against OPEIU Local 29 arose out of the same "conduct,

5    transaction, or occurrence" set forth in the original complaint to satisfy FRCP 15(c)(1)(B),

6    plaintiff has failed to show that the addition of OPEIU Local 29 met the notice requirements of

7    FRCP 15(c)(1)(C).  *First*, plaintiff has put forth no arguments that the union received actual or

8    constructive notice of the instant action within 120 days — the period provided under Rule 4(m)

9    for serving the summons and complaint — after plaintiff had filed her original complaint.  Given

10   that the original complaint was filed on May 28, 2009, the 120-day period set forth by Rule 4(m)

11   expired on September 20, 2009.  According to OPEIU Local 29's principal officer, Tamara

12   Rubyn, the union first received actual notice of the instant lawsuit in mid-December 2009, well

13   after the 120-day period had expired (Rubyn Decl. ¶ 2).  For this reason alone, the addition of the

14   union cannot "relate back" to the original complaint under FRCP 15(c).

15   *Second*, even if the union could be charged with constructive notice of the instant action

16   prior to September 20, 2009, plaintiff has not shown that the union "knew or should have known

17   that the action would have been brought against it, but for a mistake concerning the proper party's

18   identity."  On this point, it is well-established that a discharged employee with a breach of

19   contract claim against an employer and a fair representation claim against the union — *i.e.*, a

20   "hybrid" LMRA Section 301 claim — may sue both defendants or "may, if he chooses, sue one

21   defendant and not the other[.]"  *DelCostello*, 462 U.S. at 165.  In other words, an aggrieved

22   employee is free to bring a "hybrid" LMRA Section 301 lawsuit solely against her employer

23   without naming the union as a defendant.  *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978,

24   987 (9th Cir. 2007) ("An employee can support an action for breach of the collective bargaining

25   agreement, brought solely against the employer, by showing that the union violated its duty of fair

26   representation.").  Since the union's initial exclusion from the lawsuit was unremarkable under

27   *DelCostello*, it follows that OPEIU Local 29 neither knew nor should have known that the instant

28   action would have been brought against it.  There was no indication that plaintiff made a "mistake

17

1    concerning the proper party's identity" in her original complaint — she was free to sue Kaiser

2    and not the union.

3        In any event, it is the plaintiff who "must show" that an amendment "relates back" under

4    FRCP 15(c).  *See Krupski v. Costa Crociere S.p.A.*, ---- U.S. ----, ----, 130 S.Ct. 2485, 2492

5    (2010).  Plaintiff has not met that burden here.  In fact, plaintiff devotes less than a page of her

6    brief to address this issue, stating only the following unpersuasive arguments (P's Opp. to

7    OPEIU's Mot. 12):

> The fundamental basis of Defendant Union's argument in reliance
> upon the authority cited, is its 'tongue in cheek' assertion that it
> had no knowledge of the original (pro per) complaint filed herein
> on May 28, 2009, less than three months after Pierce received the
> March 4, 2009 notice, from the Union that it would not take her
> termination grievance to arbitration, notwithstanding said
> complaint naming Kaiser and Does 1 through 25 as Defendants,
> also at paragraphs 5 and 19 it referred to the breach by [OPEIU]'s
> breach of its duty of fair representation to her.  It concedes that
> Kaiser informed it of the First Amended Complaint filed herein on
> December 16, 2009, in which [OPEIU Local 29] was added as a
> defendant.
>
> Shortly thereafter, after suggestion by Union counsel, a second
> amended complaint was filed herein on February 17, 2010,
> substituting OPEIU, Local 29 in place of the International as
> Defendant.
>
> Thusly, the Union cannot seek refuge in authority cited by it now
> suggest that it was not on notice of this action within the six month
> statute of limitations period beginning March 4, 2009.  Said
> original complaint was filed on May 28, 2009, clearly within the
> limitations period.  Furthermore, said first and second amended
> complaints must clearly relate back to the filing of the original
> complaint on May 28, 2009, in compliance with Federal Rules of
> Civil Procedure, Rule 15.

22       None of these points warrants a finding that the untimely addition of the union to this

23   action "relates back" to the filing of the original complaint.  Accordingly, OPEIU Local 29's

24   motion for summary judgment on the grounds that plaintiff's claims against it are time-barred is

25   **GRANTED**.  Plaintiff's motion for summary judgment against OPEIU Local 29 is **DENIED**.

26       **2.    THE MERITS OF PLAINTIFF'S CLAIMS**

27       Even if the union had been timely added to this lawsuit, summary judgment in its favor

28   would nonetheless be warranted.  As the Supreme Court made clear in *DelCostello*, whether an

employee names the employer or the union as a defendant in a "hybrid" LMRA Section 301 action, "the case he must prove is the same whether he sues one, the other, or both." *DelCostello*, 462 U.S. at 165. In other words, if plaintiff's claim against Kaiser fails, so too would her claim against the union. As explained below, Kaiser has successfully demonstrated that there are no genuine issues of material fact and that — based upon the undisputed summary judgment record — it is entitled to judgment as a matter of law.

### A.     Breach of the Duty of Fair Representation

To prevail in her "hybrid" LMRA Section 301 action against Kaiser, plaintiff "bears the burden of proving two claims — first, that the employer breached the collective bargaining agreement, and second, that the labor union breached its duty of fair representation." *Soremekun*, 509 F.3d at 987 (citing *DelCostello*, 462 U.S. at 165). This order will address the duty of fair representation first.

A union breaches its duty of fair representation when its "conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Beck v. UFCW, Local 99*, 506 F.3d 874, 879 (9th Cir. 2007) (quoting *Vaca v. Sipes*, 386 U.S. 171, 190 (1967)). Conduct can be classified as arbitrary "only when it is irrational; when it is without a rational basis or explanation." *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 46 (1998). This deferential standard for arbitrary conduct "gives the union room to make discretionary decisions and choices, *even if those judgments are ultimately wrong*." *Id.* at 45–46 (emphasis added). The burden of proving a breach of the duty of fair representation falls squarely on the employee asserting the claim. *Vaca*, 386 U.S. at 193.

A two-step framework applies when evaluating whether a union has breached its duty of fair representation:

> First, [a court] must decide whether the alleged union misconduct involved the union's judgment, or whether it was procedural or ministerial. Second, if the conduct was procedural or ministerial, then the plaintiff may prevail if the union's conduct was arbitrary, discriminatory, or in bad faith. However, if the conduct involved the union's judgment, then the plaintiff may prevail only if the union's conduct was discriminatory or in bad faith.

*Wellman v. Writers Guild of America, West, Inc.*, 146 F.3d 666, 670 (9th Cir. 1998); *see also*

*Beck*, 506 F.3d at 879–80 (9th Cir. 2007).  Given this framework, this order must first determine

whether the union's decision to forego arbitration of plaintiff's grievance was an exercise of

"judgment" or the result of "a failure to perform a procedural or ministerial act."  *See Beck*, 506

F.3d at 880.

The union's handling of plaintiff's grievance has been covered in great detail herein.  In

support of its motion for summary judgment, OPEIU Local 29 submitted declarations from Terry

Keller, the union representative who plaintiff hand-picked to handle her grievance, Andrew

Baker, the attorney who provided legal advice to union officers on whether plaintiff's grievance

was likely to succeed at arbitration, and Tamara Rubyn, the union's president and principal

officer who participated in the decision to forego arbitrating plaintiff's grievance.  These

declarations tell a vivid and undisputed story of how the union followed the multi-step grievance

procedure set forth in the CBA "to a 'T'", and properly exercised its judgment when it decided to

forego arbitration of plaintiff's grievance.  No reasonable jury could find, given the undisputed

summary judgment record, that the union's decision to forego arbitration was the result of a

"fail[ure] to perform some procedural [or ministerial] act."  *See ibid.* (listing examples of

ministerial omissions such as missing deadlines without explanation or failing to even submit

grievances).  Additionally, no reasonable jury could find that the union's exercise of judgment —

even if ultimately wrong — was discriminatory or made in bad faith.

Plaintiff's declaration — pared down to its admissible and relevant morsels — fails to

create any genuine issues of material fact with respect to the evidence submitted by the union.

Plaintiff's only so-called "evidence" that OPEIU Local 29's conduct in handling her grievance

was "arbitrary, discriminatory, or in bad faith" is her unsupported conjecture.  She provides no

competent evidence showing that the union discriminated against her, acted arbitrarily, or acted in

bad faith except for a vague assertion that her grievance was supported by "overwhelming

evidence" that the union "ignored" (Pierce Decl. ¶ 29).  Plaintiff, however, provides no specific

evidence of how the union "ignored" her grievance besides pointing to its ultimate decision to

forego arbitration.  This is insufficient as a matter of law to establish a breach of the duty of fair

20

United States District Court
For the Northern District of California

1  representation.  As stated, the law "gives the union room to make discretionary decisions and

2  choices, even if those judgments are ultimately wrong."  *Marquez*, 525 U.S. at 45–46.  Plaintiff's

3  disagreement over the union's ultimate decision on her grievance stands in the shadow of

4  mountains of undisputed evidence showing how the union complied with the grievance

5  procedures in the CBA and exercised its judgment — with the advice of counsel — in foregoing

6  arbitration.  Plaintiff's conclusory statement that this decision was "irrational" and "arbitrary"

7  cannot defeat summary judgment.  *Surrell*, 518 F.3d at 1103; *see also Nilsson v. City of Mesa*,

8  503 F.3d 947, 952 n.2 (9th Cir. 2007) (explaining that a "conclusory, self-serving affidavit,

9  lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of

10  material fact") (internal quotation marks and citation omitted).

11        In sum, based upon the undisputed summary judgment record, this order finds that no

12  reasonable jury could conclude that OPEIU Local 29's handling of plaintiff's grievance, and its

13  ultimate decision to forego arbitration, was "arbitrary, discriminatory, or in bad faith."  Since

14  plaintiff cannot establish that the union breached its duty of fair representation, she cannot — as a

15  matter of law — prevail on her "hybrid" LMRA Section 301 claim against either defendant.  *See*

16  *Soremekun*, 509 F.3d at 987.  Kaiser's motion for summary judgment is therefore **GRANTED**.[5]

17  Plaintiff's motion for summary judgment against Kaiser is **DENIED**.

18        **B.      Breach of the Collective Bargaining Agreement**

19        To eliminate any doubt that plaintiff's "hybrid" LMRA Section 301 claim fails as a matter

20  of law, this order also concludes that no reasonable jury could find  — based upon the undisputed

21  summary judgment record — that Kaiser breached the CBA governing plaintiff's employment by

22  terminating her without "just cause."

23        The CBA provides no definition of the phrase "just cause."  The California Supreme

24  Court, however, has explained that the termination of an employee for "cause" means that the

25  basis of the termination must be "a fair and honest cause or reason, regulated by good faith" as

26  opposed to one that is "trivial, capricious, unrelated to business needs or goals, or pretextual."

27

28        [5]  This failure also provides an additional basis for granting the union's summary judgment motion and denying plaintiff's motion against the union.

21

*Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 336 (2000).  In this connection, Kaiser submitted a trio of undisputed declarations in support of its motion for summary judgment.  These declarations were from Douglas Lynch, who conducted the investigation of the $255 in missing funds, and two of plaintiff's supervisors, Sondra Thurston and Marquette Stockton.  As explained in detail herein, a lengthy investigation was conducted into the disappearance of these funds, both before and after Kaiser met with plaintiff.  At the close of the investigation, Kaiser officials concluded that the clear video evidence produced by Loomis, combined with their own observations that the January 29 deposit envelope had not been "tampered with," demonstrated that plaintiff had *not* put the missing funds into the January 29 deposit envelope before dropping it into Kaiser's safe.  In other words, the undisputed evidence shows that Kaiser properly investigated the matter, gave plaintiff a chance to make her case, and reasonably concluded based upon its investigation that there was "just cause" for termination.  No reasonable jury could conclude otherwise.

Plaintiff's declaration — stripped down to its admissible elements — fails to create any genuine issues of material fact with respect to this evidence of due diligence produced by Kaiser.  The heart of plaintiff's argument is that she didn't take the money and that Kaiser should have taken her word for it.  This argument is rejected.  The critical question is not whether plaintiff *actually* misappropriated the funds.  Rather, it is whether Kaiser had a "fair and honest" basis to terminate plaintiff.  Given the undisputed summary judgment record, no reasonable jury could find that Kaiser managers and supervisors violated the "just cause" provision of the CBA when it terminated plaintiff's employment after investigating the matter.  Stated differently, the uncontroverted evidence shows that Kaiser employees fairly and reasonably concluded, based upon compelling evidence, that plaintiff had violated Kaiser's Cash Handling Agreement and Principles of Responsibility.

This order also rejects plaintiff's uncorroborated allegations that Kaiser subjected her to "ongoing, unlawful, and unfair employment practices" in violation of 28 U.S.C. 158(a).  These vague allegations — which were copied from the operative complaint — are unsupported by plaintiff's own deposition testimony.  Specifically, plaintiff admitted at her deposition that the "ongoing, unlawful, and unfair employment practices" alleged in her complaint actually came

1   from her fellow *co-workers* and not from any Kaiser supervisors (Pierce Dep. 83–91, 96–97).

2   Plaintiff also conceded that prior to her termination, any and all complaints that she had raised

3   with the union were resolved in her favor.  Finally, plaintiff acknowledged that she had never

4   been formally disciplined by Kaiser prior to her termination, even after a similar "cash shortfall"

5   incident occurred in 2006 (*id.* at 77, 78–81, 90–97, 101–05).[6]  All in all, plaintiff failed to produce

6   any specific and admissible evidence of "ongoing, unlawful, and unfair employment practices" by

7   Kaiser to substantiate these allegations.

8          For these reasons, this order concludes — based upon the undisputed summary judgment

9   record — that no reasonable jury could find that Kaiser breached the "just cause" provision of the

10  CBA when it terminated plaintiff's employment in May 2008.  This provides a separate and

11  independent basis for granting defendants' motions for summary judgment and denying plaintiff's

12  motion for partial summary judgment.

13                                **CONCLUSION**

14         This "hybrid" LMRA Section 301 action is not about whether plaintiff Sheila Pierce

15  actually stole $255 in funds from Kaiser.  Rather, it is about whether plaintiff has evidence to

16  support her "hybrid" claim that Kaiser terminated her without "just cause" *and* that OPEIU

17  Local 29 breached its duty of fair representation to her.  As explained herein, plaintiff has failed

18  to produce competent evidence to support either allegation.  For these reasons, plaintiff's motion

19  for partial summary judgment is **DENIED**.  Kaiser's motion and OPEIU Local 29's motion for

20  summary judgment are both **GRANTED**.  Judgment will be entered accordingly.

21

22         **IT IS SO ORDERED.**

23

24  Dated:  November 4, 2010.

25                                          WILLIAM ALSUP
                                            UNITED STATES DISTRICT JUDGE

26  _____

27         [6]  Contrary to plaintiff's declaration, she was *not* "terminated" by Kaiser in 2006.  This statement
    directly contradicts her deposition testimony.  As plaintiff herself explained during her deposition, Kaiser
    mailed her a termination letter *in error*.  When she asked her supervisors about it, they told her that she was
28  definitely *not* terminated, that the letter should not have been mailed, and that she should report to work as if the
    letter had never been mailed (Pierce Dep. 99–103).